United States District Court
Southern District of Texas
**ENTERED**
November 22, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WINSUPPLY E. HOUSTON, TX COMPANY | § § § § | CIVIL ACTION NO. 4:21-cv-01387 |
| Plaintiff, | § § § | |
| vs. | § § § § | JUDGE CHARLES ESKRIDGE |
| LAURA BLACKMON, *et al*, | § § § | |
| Defendants. | § | |

ORDER DENYING PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION

This action concerns allegations of theft of trade secrets, breach of fiduciary duty arising from restrictive covenants in certain employment agreements, interference with customer relations, and aiding and abetting the same. Dkt 1 at ¶¶ 1–3.

Plaintiff Winsupply E Houston, TX Company filed a motion for a temporary restraining order and preliminary injunction with its original complaint in April 2021. Dkt 3. Winsupply eventually negotiated an agreed TRO with Defendants and engaged in expedited discovery. See Dkt 70 at 9.

Its motion for preliminary injunction is now denied.

1. Findings of fact

An evidentiary hearing proceeded by Zoom video conference on August 12, 2021. See Dkt 56. Unfortunately, the electronic recording was found to be unusable. The parties were thus instructed to prepare their post-hearing filings by deposition designation and good-faith recollection of live witness testimony. Dkt 61. They then

provided competing versions of proposed findings of fact and conclusions of law. See Dkts 65–68.

The parties had also been ordered at the conclusion of the hearing to file on the docket all admitted exhibits. Dkt 56. They didn't and were again ordered to do so. Dkt 79. Winsupply made such filing. See Dkts 80–85 & 87–89. Defendants eventually advised the Court by email to its Case Manager that they would rely on those filed by Winsupply. Given the disjointed nature of the filings, the parties' record citations don't always reliably match up to the docketed exhibits. Also problematic is the fact that their deposition designations generally cite to time stamps (rather than to page and line), while the docketed depositions don't reflect time stamps on their printed pages.

The following findings of fact are based on the pleadings, the argument of counsel, a review of the post-hearing briefing by the parties, and review of all exhibits as submitted at hearing, along with other filings by the parties. Citations are as accurate as possible given the record.

a. Initial background

MSI Supply Inc is a distributor of pipe, valve, and fitting products to oil and gas customers in the Houston area. Dkt 1 at ¶11. Defendant Laura Blackmon began employment with MSI on February 1, 2016. See Dkt 1-1 (Blackmon employment agreement). Defendant Victoria Johnson began employment with Winsupply on August 10, 2020. See Dkt 1-2 (Johnson employment agreement).

Winsupply purchased all of the equity in MSI in November 2008, and MSI transferred its assets and liabilities to Winsupply effective December 2018. Dkt 68 at ¶¶ 17–18. Winsupply and MSI continued to operate as separate and distinct entities, with MSI maintaining a facility in a different location. MSI also utilized a different payroll system, commission structure, and internal office system, and offered different benefits. But it was all coordinated through Winsupply's corporate offices. Dkt 66-1 at ¶ 7.

Defendant TPC Industrial LLC is also a PVF distributor and direct competitor of MSI in the Houston market. Dkt 1 at ¶ 29. TPC hired Johnson in February 2021 and Blackmon in March 2021. Dkt 68 at ¶ 72. They continue at present to work for TPC.

### b. Employment agreements

Winsupply bases its request for injunctive relief in part on noncompetition and nonsolicitation provisions of MSI employment agreements with Blackmon and Johnson. See Dkts 1-1 & 1-2. Both agreements concern at-will employment for the provision of personal services and include competition restrictions for two years following the date employment is terminated. The record contains no evidence of a valid assignment by Blackmon or Johnson of those services to Winsupply.

The agreement between MSI and Blackmon restricts competition to a geographic area covering a sixty-mile radius of zip code 77020. Dkt 1-1 at 5. The agreement between MSI and Johnson restricts competition to a geographic area covering a thirty-mile radius of zip code 77015. Dkt 1-2 at 5. Blackmon also executed a retention bonus agreement that included the same "Noncompetition Provision" contained in her initial employment agreement on January 4, 2018. Dkt 81-30 at 2.

### c. Confidentiality agreements

After signing employment agreements with MSI, Blackmon and Johnson signed multiple confidentiality agreements with Winsupply. For example, see Dkts 81-20; 81-21 at 1 (Johnson agreements); see also Dkts 82-1 at 1; 82-2 at 1; 82-3 at 1 (Blackmon agreements). In doing so, they agreed (among other things) that all of the following were confidential and/or trade secrets, whether in written or oral form:

- o All Winsupply prospective and/or existing clients and customers;
- o Client and customer lists and information;
- o Purchasing and sales data and reports;
- o Pricing lists and information;

3

- o Financial information, including cost and performance data; and
- o Marketing and business strategies.

See Dkts 81-17 at 4; 81-20; 81-21 at 1; 81-29 at 4; 81-30 at 2; 82-1 at 1; 82-2 at 1; 82-3 at 1.

The final agreements between Winsupply and both Johnson and Blackmon were confidentiality agreements executed in November 2020. Dkts 81-21 at 1 & 82-3 at 1. But neither of those agreements (nor any other agreement between Winsupply and either of Johnson or Blackmon) contained any reference to the restrictive covenants or prior employment agreements or the retention bonus agreement between Blackmon and MSI.

   d. Blackmon employment

Winsupply employed Blackmon as an outside salesperson responsible for establishing, developing, and maintaining relationships with certain specific customers. See Dkt 81-28 (Blackmon Winsupply customers, November 2019 to February 2021). She developed an extensive customer base and personal relationships with her customers in the PVF industry, including Bluewing, Ohmstede, and Primoris—some of whom she had personal relationships with prior to joining MSI. Dkt 66-1 at 4. Jeff Walker is the highest ranking Winsupply representative to testify. He established that during her employment with Winsupply, Blackmon became the "top salesperson" at MSI. Dkt 81-6 at 26.

Prior to employment with Winsupply, Blackmon had no experience selling PVF products. Dkt 87-8 at 12. During her Winsupply employment, she learned much of what she now knows about PVF products, including their sales, application, and use. Id at 13. Blackmon used the knowledge and experience gained to locate customers with whom she developed strong relationships and provided quality service. Id at 13–14; see also Dkt 66-1 at 4. According to Blackmon, the January 2018 retention bonus agreement was offered to her by MSI in an effort to retain her services after learning that she'd been offered

employment by Ohmstede, who was one of her Winsupply customers. See Dkts 66-1 at 4–5; 81-30 (Blackmon retention bonus agreement).

Blackmon was never a member of senior management or responsible for supervising, establishing, developing, maintaining, or tracking relationships with all MSI or Winsupply customers. Dkt 66-1 at 5. Blackmon was responsible only for establishing new customer relationships, and then developing, maintaining, and tracking relationships with those identified as her specific customers. Ibid. She wasn't expected "to maintain relationships with *all* of the company's customers." Ibid (emphasis in original).

While performing her duties as a salesperson, Blackmon sometimes received information regarding sales to her customers. Ibid. This information included the prices that customers were charged, along with the company's profit margins for those sales. Ibid. But she didn't receive or review specific information concerning those prices or sales margins for other salespersons. Ibid. Further, due to market competition and fluctuation in the cost of materials and finished products, sales margin and prices changed constantly. Ibid; see Dkts 81-2 (email concerning customer margin) & 81-28 (Blackmon customer sales data). And Walker testified that market prices and margins varied and changed frequently, and that he wasn't aware of confidentiality agreements with customers concerning pricing. Dkt 81-6 at 20, 32–33.

Blackmon testified that she became unhappy with Winsupply management and began seriously considering employment with TPC in late 2020. Dkt 87-8 at 5; see also Dkt 66-1 at 8. She and Walker also fell into a dispute concerning unpaid commissions for her January 2021 sales. Dkt 87-8 at 28–29. Blackmon claims that the commissions should have been paid the first week of February 2021 but were intentionally withheld by Walker. Id at 29.

Walker ultimately terminated Blackmon's Winsupply employment on March 3, 2021. Dkts 87-8 at 6 & 81-6 at 7.

Her employment with TPC officially began on March 10, 2021. Dkt 81-5 at 2.

### e. Johnson employment

Johnson also had no experience selling PVF products prior to employment with Winsupply. Dkt 88-1 at 3 (Johnson deposition). Her six-month employment with Winsupply began in August 2020 as an entry-level, hourly sales assistant. Dkt 88-1 at 3; see also Dkt 81-17 at 1. When she resigned in February 2021, she was performing duties of an inside salesperson but had never received commissions. Dkt 66-1 at 5; see also Dkt 68 at 5. Johnson's duties generally involved office tasks such as running errands, taking orders from customers, obtaining quotes, and communicating with customers. Dkt 88-1 at 13; see also Dkt 66-1 at 5. She shared a log-in with other Winsupply employees but was never responsible for invoicing customers. Dkt 88-1 at 13–14; see also Dkt 66-1 at 5.

To the extent Johnson's duties included customer service, they didn't involve outside sales activities such as soliciting business or visiting customers. Dkt 88-1 at 13–14; see also Dkt 66-1 at 5. But Johnson did perform inside sales support for Blackmon and all other Winsupply outside salespeople. Dkt 68 at 5. As such, she interacted with all Winsupply customers. Dkt 88-1 at 8.

Testimony established that Johnson independently met TPC's owners while picking up a Winsupply order from TPC. They were impressed by her and asked if she might be interested in employment. Ibid. Johnson testified that she was dissatisfied with Winsupply because of unprofessional conduct in the office, high turnover, and other conflicts. Id at 16–18; see also Dkt 66-1 at 8. Johnson stated that she also felt that the location of TPC and its family friendly atmosphere would better suit her. Dkt 88-1 at 5, 9; see also Dkt 66-1 at 8–9. She officially began employment with TPC on February 22, 2021. Dkt 88-1 at 5; see also Dkt 68 at 19.

f. Certain PVF industry norms

The identity of potential customers who buy the kind of industrial parts and equipment sold by Winsupply and TPC in the Houston area are readily available to industry competitors. For example, Blackmon and Houston Glover—who is president and an owner of TPC—both credibly testified that experienced PVF salespeople can easily identify PVF purchasers through public sources, industry events, industry area cold-calling, and personal relationships formed by living in a community populated by other oil and gas industry employees. Dkt 66-1 at 6. And Danny Malone—who is a vice-president of Bluewing, a PVF customer—testified that, because it's no secret that he's a purchaser for Bluewing, he receives about twenty calls per day from salespeople in the industry. Dkt 89-1 at 14, 30 (Malone deposition). He also testified that it's easy to find him through public sources like LinkedIn, Google, and other sites for generating sales leads. Id at 30.

It's also standard practice for PVF distributors such as TPC and Winsupply to compete for and often succeed in selling to the same set of customers. They also buy and sell from each other. Dkt 87-8 at 19; see also Dkt 66-1. Malone testified that materials distributors often refer him to competitors if they don't have immediate supply on hand, and that they all trade between themselves as part of an overall supply chain. Dkt 89-1 at 16; see also Dkt 66-1 at 6.

It was also established that sales margins and prices constantly change due to market competition and fluctuation in cost for materials and finished products. Dkt 87-8 at 19; see also Dkts 88-1 at 12, 81-28, & 81-2. For instance, Walker confirmed that prices and margins frequently changed, and he was unaware of any confidentiality agreements between Winsupply and its customers. Dkt 81-6 at 18–20, 33. Likewise, he confirmed that Winsupply routinely received requests from customers to "match" the prices of competitors. Id at 20–21. And those requests were regularly honored without requiring that the customers sign confidentiality agreements. See id at 33.

7

Testimony also established that the relationship between a salesperson and his or her customers is of primary importance. For example, see Dkts 87-8 at 1, 88-1 at 24, 88-1 at 17–18, & 89-2 at 8 (Lopez deposition). Not surprisingly, then, it is customary for purchasing personnel at companies that buy PVF products to follow a good salesperson that leaves one company for another. Dkt 89-1 at 25.

g. Documentary and testimonial facts

Both Blackmon and Johnson voluntarily provided their cell phones to Winsupply for forensic imaging associated with this lawsuit. Dkt 66-1 at 6. Such imaging revealed several deleted text messages between Glover and both Blackmon and Johnson. See Dkt 64 at 1 (joint stipulation of facts). Some messages concerned a desire by Blackmon and Johnson to leave Winsupply to become TPC employees. See generally Dkts 83-4 & 83-5. Others discussed a printout of Blackmon's Winsupply sales that was allegedly to be delivered to Glover, along with other potential customers she might solicit from Winsupply. See generally Dkts 64 & 83-4. Winsupply asserts that forensic imaging of Blackmon's cell phone also revealed three "customer lists" allegedly attached to emails between Winsupply management and Blackmon, including one dated September 14, 2016. See Dkt 68 at 16–17.

Blackmon testified that Winsupply terminated her email access when her employment was terminated on March 3, 2021—meaning that she no longer had access to any emails or attachments after that point, including the alleged "customer listings." Dkt 66-1 at 7. And she testified that she hadn't used any Winsupply materials since her termination. Ibid.

Winsupply presented no actual evidence that Blackmon delivered any customer lists to TPC. It also didn't present evidence that Johnson retained, used, or disclosed any confidential Winsupply documents after her resignation. But Winsupply did establish that Blackmon helped divert two specific Bluewing quotes from Winsupply to TPC in February 2021. See Dkts 81-9, 81-10, & 81-11.

8

And Glover himself admitted that while Blackmon was still employed by Winsupply, he created a TPC email address for her and (posing as her) several times sent emails from that address to Bluewing. Dkt 88-2 at 20, 25.

### 2. Legal standard

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Yellowstone Landscape v Fuentes*, 2020 WL 4547150, \*3 (SD Tex), quoting *Munaf v Geren*, 553 US 674, 690 (2008). The Fifth Circuit frequently cautions that granting a preliminary injunction is the exception—not the rule. *House the Homeless Inc v Widnall*, 94 F3d 176, 180 (5th Cir 1996). It characterizes the burden on the movant as one requiring "the movant to unequivocally show the need for its issuance." *Valley v Rapides Parish School Board*, 118 F3d 1047, 1050 (5th Cir 1997).

The party seeking a preliminary injunction must establish:

- *First*, a substantial likelihood of success on the merits;
- *Second*, a substantial threat of irreparable injury if the injunction isn't granted;
- *Third*, the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and
- *Fourth*, the injunction wouldn't disserve the public interest.

*Robinson v Hunt County*, 921 F3d 440, 451 (5th Cir 2019) (quotation marks omitted).

### 3. Conclusions of law

Winsupply has shown a substantial likelihood of success on the merits only with respect to narrow aspects of its claims for breach of fiduciary duty and the aiding and abetting of that breach (along with related aspects of unjust enrichment). But it hasn't shown a substantial threat of imminent and irreparable harm as to those claims.

a. Likelihood of success on the merits

*As to violation of the federal Defend Trade Secrets Act against all Defendants.* To prevail on a federal trade secret misappropriation claim, a plaintiff must show that it owns a trade secret; its trade secret was misappropriated; and the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 USC § 1836(b)(1). The DTSA defines a *trade secret*, in part, as:

> [A]ll forms and types of . . . financial, or business . . . information . . . including . . . processes, or procedures . . . whether tangible or intangible, and whether or how stored, complied, or memorized physically, or electronically . . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 USC § 1839(3)(A), (B).

Winsupply contends that information such as points of contact, pricing, quotes, and gross margins concerning its actual and prospective customers is entitled to trade secret protection. Dkt 70 at 4; see also Dkt 68 at 25. But it hasn't put forth sufficient evidence that its customer lists are *not* readily ascertainable through proper means. It is doubtless true that Winsupply's customer lists are a valuable tool by which it sorts and identifies top customers. And it may even be that access to such customers is difficult to obtain. But the identity of actual and potential customers in the Houston area that purchase the products and equipment sold by Winsupply and TPC simply isn't a secret. Most, if not all, of the information necessary to determine Winsupply PVF customers is readily and publicly available.

The plain language of the DTSA doesn't offer trade secret protection to information that is readily available through proper means. As such, there isn't a substantial likelihood of success on the merits as to this claim.

*As to violation of the Texas Uniform Trade Secrets Act against all Defendants.* To prevail on a claim of trade secret misappropriation under Texas law, a plaintiff must show the existence of a trade secret; acquisition of the trade secret through breach of a confidential relationship or discovery by improper means; and unauthorized use of that trade secret. See *Wellogix Inc v Accenture LLP*, 716 F3d 867, 874 (5th Cir 2013). A *trade secret* in this respect is defined as "a process or device for continuous use in the operation of [a] business," and "may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Hyde Corporation v Huffines*, 314 SW2d 763, 776 (Tex 1958) (quotations marks omitted); see Tex Civ Prac & Rem Code Ann § 134A.002(6).

Analysis of this claim is much the same as that under the DTSA. Again, the subject customer lists being readily ascertainable through proper means is dispositive. For example, see *Baxter & Associates LLC v D&D Elevators Inc*, 2017 WL 604043, *9 (Tex App—Dallas, no pet). As such, there isn't a substantial likelihood of success on the merits as to this claim.

*As to breach of contract against Blackmon and Johnson related to the confidentiality, noncompete, and nonsolicitation provisions of their employment agreements.* The elements of a breach-of-contract claim are, "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Binh Hoa Le v Exeter Finance Corporation*, 990 F3d 410, 415 (5th Cir 2021) (quotation marks omitted).

Winsupply fails to establish that it's a party to the noncompete with Blackmon. Of importance here, a

11

noncompete tied to a personal services contract—such as that between Blackmon and MSI—can't be assigned or transferred by the employer without the employee's consent. *Intertek Asset Integrity Management Inc v Dirksen*, 2021 WL 1047055, *5–6 (Tex App—Tyler, no pet) (mem op). And Winsupply fails to establish that Blackmon agreed to assignment of the noncompete that she executed with MSI.

Winsupply also urges that the contractual language of its employment agreement with Blackmon itself binds her to any subsequent assignment. That isn't quite accurate. Winsupply relies on language in the agreement stating that Blackmon is bound to any "permitted successors and assigns." But this provision is binding only in the event of a permitted assignment. In other words, only a *valid* assignment—one to which she expressly agreed—would bind Blackmon. And Blackmon never expressly consented to assignment of her employment agreement, nor was she ever asked to do so. Winsupply makes a similar argument with respect to Blackmon's retention bonus agreement, asserting that it binds her because it contains the same restrictive covenants as her employment agreement. But that retention agreement, too, was never expressly assigned by Blackmon.

Because Winsupply didn't have a valid noncompete agreement with Blackmon, there isn't a substantial likelihood of success on the merits as to this claim. It therefore needn't be considered whether Winsupply met its burden regarding reasonableness as to the scope of that agreement.

The Johnson employment agreement was executed after the transfer of assets from MSI to Winsupply, removing any question as to validity of assignment. But as would be the case with the Blackmon agreement, the scope of the Winsupply noncompete as to Johnson is overbroad on its face because it isn't limited to her customers, rendering the noncompete invalid. For example, see *D'Onofrio v Vacation Publications Inc*, 888 F3d 197, 211–12 (5th Cir 2018). Winsupply therefore doesn't have a

substantial likelihood of success on the merits of this claim as to Johnson.

*As to breach of fiduciary duty against Blackmon.* The essential elements of such a claim are the presence of a fiduciary relationship, breach of a fiduciary duty, and resulting injury to the plaintiff or benefit to the defendant. See *Navigant Consulting Inc v Wilkinson*, 508 F3d 277, 283 (5th Cir 2007). A formal fiduciary relationship under Texas law "arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." Ibid (quotation marks omitted). And with respect to the scope of such a duty as between employer and employee, "the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency." Ibid (quotation marks omitted). But the employee's fiduciary duty doesn't generally continue after termination of the employment relationship. *Hunn v Dan Wilson Homes Inc*, 789 F3d 573, 581 (5th Cir 2015).

Winsupply mustered substantial evidence that Blackmon (while still employed by Winsupply) directed certain customers (including Bluewing and Ohmstede) to TPC in the weeks prior to her termination. Defendants characterize that as simply a "messy transition." To the contrary, it was the active and intentional solicitation of Winsupply customers by Blackmon prior to her departure.

There's a substantial likelihood of success on the merits as to this claim, at least as to some portion of the challenged time period. Whether injury within that time period is irreparable or ongoing is considered below.

*As to aiding and abetting breach of fiduciary duty against TPC and Johnson.* The essential element of such a claim is knowing participation in the breach of a fiduciary duty. See *Meadows v Hartford Life Insurance Co*, 492 F3d 634, 639 (5th Cir 2007). Where a third party knowingly participates in such a breach, that party becomes a joint tortfeasor with the fiduciary and is liable as such. Ibid.

Winsupply mustered substantial evidence that Johnson and Glover actively aided Blackmon in directing Bluewing and Ohmstede to TPC. Glover admitted in quite concerning testimony that he impersonated Blackmon in numerous emails to Winsupply customers while she was still employed by Winsupply to take advantage of her personal relationships with those customers. There's also evidence that Johnson processed numerous quotes for current Winsupply customers on behalf of TPC, thus helping to divert business from Winsupply to TPC.

There's a substantial likelihood of success on the merits as to this claim. Whether injury within the applicable time period is irreparable or ongoing is considered below.

*As to tortious interference with contract against TPC.* The essential elements of this claim are the existence of a contract, willful and intentional interference with that contract, damages proximately caused by the interference, and actual damage or loss. See *Alviar v Lillard*, 854 F3d 286, 289 (5th Cir 2017). The obvious prerequisite is proof of an underlying contract that has been breached. See *Wickfire LLC v Woodruff*, 989 F3d 343, 354 (5th Cir 2021). A tortious interference claim related to an unenforceable noncompete provision necessarily fails. See *Juliette Fowler Homes Inc v Welch Associates Inc*, 793 SW2d 660, 665 (Tex 1990), *superseded on other grounds by statute as stated in Property Tax Associates Inc v Staffeldt*, 800 SW2d 349, 350 (Tex App—El Paso 1990, writ denied).

The arguments as to the validity of the underlying contracts asserted here have been addressed above. Those conclusions dictate that there isn't a substantial likelihood of success on the merits as to this claim.

*As to tortious interference with business relationship against Blackmon and TPC.* The essential elements of this claim are a reasonable probability or expectation of a contractual relationship, intentional and malicious conduct by the defendant that prevented consummation of that contract, no justification or privilege as to conduct by the defendant, and actual harm or damages caused by the

14

defendant's conduct. See *Small Business Assistance Corp v Clear Channel Broadcasting Inc*, 210 F3d 278, 280 n 1 (5th Cir 2000).

Winsupply hasn't mustered sufficient evidence as to the reasonable probability or expectation of a contractual relationship. True, it presented evidence that it had "strong relationships" with its customers prior to Blackmon and Johnson's departure—due to the very relationship of Blackmon and Johnson with those customers. But other than Walker's hearing testimony concerning Winsupply's sales history and the impact of referrals on its business, Winsupply has otherwise failed to present any specific facts regarding the reasonable probability or expectation of continued business relationships in an extremely competitive industry. In short, no evidence establishes a reasonable probability or expectation that Winsupply's customers would have continued their contractual relationships with it once Blackmon and Johnson departed. Nor does any evidence establish that any of its customers breached an existing contract because of conduct by Defendants.

There isn't a substantial likelihood of success on the merits as to this claim.

*As to unjust enrichment against all Defendants.* Texas law provides that unjust enrichment occurs where one "obtains a benefit from another by fraud, duress, or the taking of an undue advantage." *Ahmed v Shah*, 2015 WL 222171, *5 (Tex App—Houston [1st Dist], no pet). "A key element of unjust enrichment is that the person sought to be charged wrongly secured or passively received a benefit. It is not enough that the person sought to be charged received some incidental benefit." Ibid.

This is a catchall claim, without any apparent allegation of misdeed pertinent here that isn't captured within the conduct addressed above. As to the concept of fraud within this claim, the conclusion as to breach of fiduciary duty (and aiding and abetting the same) equally pertains. Nothing else related to the trade secret, contracts,

or ancillary causes of action meets the characterization of fraud, duress, or undue advantage.

There's a substantial likelihood of success on the merits as to this claim, at least as to some portion of the challenged time period. Whether injury within that time period is irreparable or ongoing is considered below.

### b. Irreparable injury

An *irreparable harm* is one for which "there is no adequate remedy at law, such as monetary damages." *Janvey v Alguire*, 647 F3d 585, 600 (5th Cir 2011). Simply put, if a legal remedy such as monetary damages exists, the plaintiff isn't entitled to an injunction—even if those damages would be difficult to calculate. *Pike*, 610 SW3d at 792–93. And critically, the irreparable harm "must be based on *future harm* arising from *future activity* if not enjoined." *Amid Inc v Medic Alert Foundation United States Inc*, 241 F Supp 3d 788, 824 (SD Tex 2017) (emphasis added).

Considered here are only the causes of action for which a substantial likelihood of success on the merits exists, being breach of fiduciary duty and related aiding and abetting of that breach (along with related aspects of unjust enrichment). When Blackmon terminated her employment with Winsupply, her fiduciary duty to it also ended. This necessarily means that any alleged breach of fiduciary duty (and related aiding and abetting) occurred in the past and may be appropriately remedied with a damages award. For example, see *Marek Brother Systems Inc v Enriquez*, 2019 WL 3322162, *3 (ND Tex); see also *BCOWW Holdings LLC v Collins*, 2017 WL 3868184, *17–19 (WD Tex) (effects from past breach of fiduciary duty don't support injunctive relief where defendant is no longer employed by plaintiff).

Beyond that observation, the ultimate harm alleged by Winsupply is loss of customer sales. While that might be somewhat difficult to quantify, it still can be readily compensated by a damages award for lost profit damages. Both federal and Texas state courts have denied injunctive

relief on this basis. For example, see *Global Consulting & Mechanical Services LLC v Austin*, 2020 WL 8267591, *7–8 (ED Tex) (collecting cases); *Midstate Environmental Services LP v Atkinson*, 2017 WL 6379796, *4 (Tex App—Corpus Christi, no pet); *Reach Group LLC v Angelina Group*, 173 SW3d 834, 838 (Tex App—Houston [14th Dist], no pet).

Winsupply hasn't established a substantial threat of imminent and irreparable harm if the preliminary injunction isn't granted. But it must be acknowledged that the conduct underlying the claims for breach of fiduciary duty and related aiding and abetting appears without question to be knowing and intentional, and perhaps malicious. It will be determined at another time whether this will support a demand for punitive damages upon submission of the case to the jury. Regardless, the measure of actual damages submitted to the jury will likely be the broadest available under the law.

    c.   Balance of potential harms and consideration of the public interest

Because Winsupply hasn't shown a substantial threat of imminent and irreparable harm, it needn't be considered whether the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, or whether the injunction is consistent with the public interest.

    4.   Conclusion

The motion for preliminary injunction by Plaintiff Winsupply E. Houston, TX Company is DENIED. Dkt 3.

SO ORDERED.

Signed on November 22, 2021, at Houston, Texas.

*[signature: Chs R Eskridge II]*

Hon. Charles Eskridge
United States District Judge